UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6: 04-74-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WOODROW JONES and | ) | **MEMORANDUM OPINION** |
| ALICE JONES, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On November 22, 2004, Defendant Woodrow Jones entered a guilty plea to two counts of a three count indictment charging him with (i) conspiracy to distribute and possess with intent to distribute marijuana and (ii) money laundering under 21 U.S.C. §§ 846, 841(a)(1) and 18 U.S.C. § 1956(h), respectively. [Record No. 65] A few days later, Alice Jones, Woodrow Jones' wife and co-Defendant, moved the Court to be rearraigned on Counts I and II.  On November 30, 2004, Alice Jones entered a guilty plea to these counts.  Pursuant to their written Plea Agreements, both Defendants expressly reserved the right to contest forfeiture of the real property which was the subject of Count III. [*See* Record Nos. 63 and 70; Plea Agreements ¶ 10.]

Following an evidentiary hearing and briefing, the forfeiture issue is now ripe for review. Having considered the testimony and other evidence presented during the July 20, 2005 hearing, the Court concludes that the United States request for entry of a preliminary judgment of forfeiture is well-taken and should be granted.

-1-

I.      **PROCEDURAL HISTORY**

      A.      The Indictment

The indictment returned by the grand jury on October 7, 2004, charged that during the period January 2003 through March 16, 2004, Defendants Woodrow and Alice Jones conspired together and with others to knowingly and intentionally distribute and possess with intent to distribute approximately ninety kilograms or more of marijuana. In Count II of the Indictment, the grand jury charged that during this same period, the defendants conspired together and with others to knowingly transport funds and to conduct and engage in financial and monetary transactions in criminally derived property of a value greater than $10,000.00, affecting interstate commerce. More specifically, the grand jury alleged that the defendants had transported (or caused to have transported) from Kentucky to Texas, funds that were derived from dealing in controlled substances.

Count III is the forfeiture count that is presently before the Court for consideration. It contains the following allegation and property description:

> In committing the felony offense alleged in Count 1 of the indictment, the same being punishable by imprisonment for more than one year, WOODROW JONES and ALICE JONES used and intended to use the below-described property to commit and to facilitate the commission of the said controlled substance violation, and the below-described property constitutes proceeds obtained directly and indirectly as a result of the commission of the aforesaid violation of 21 U.S.C. § 846, including, but not limited to, the following:
>
> REAL PROPERTY
> BEGINNING on a Wooden Post on North side of Rooks Road; Thense North*West 304. Feet to the U.S. Government Line and Fence Post; Thense with the U.S. Government Line North 54 East 505 feet to close on a 4 foot red steel post, the second corner; Thense South East 231 feet to a steel stake 4 feet high, and near a pond; Thense South West 447 feet to

-2-

a steel stake at a wire fence and on North Side of Rooks Road; Thense South West 224 feet to BEGINNING corner, and containing three (3) and two (2) tenths acres, be the same more or less.

Said property is subject to a right of way retained in a prior deed which is described as follows: A right of ingress and egress over a (16) sixteen foot wide existing road to all their adjacent property.  An easement for all utilities is retained including water, sewage, electric, telephone, and television, on the (16) sixteen foot road right of way.

Being all the same land acquired by Alice Jones and Woodrow Jones, her husband, by deed dated the 5th day of November, 2003, and of record in Deed Book 564, Page 385, records of the Laurel County Court Clerk's Office, London, Kentucky.

[*See* Record No. 45; Indictment.] Based on these allegations, the United States seeks forfeiture

of the described property pursuant to 21 U.S.C. § 853.

        B.      The Defendants' Plea Agreements

Both Plea Agreements contain identical, agreed factual statements.  Paragraph 4 of each

Plea Agreement provides that:

4. As to Counts 1 and 2, the United States could prove the following facts beyond a reasonable doubt:

(a) That beginning in early 2003, the exact date unknown, Woodrow and Alice Jones entered into a conspiracy with Benny Neeley and others to distribute marijuana in the Eastern District of Kentucky (EDKY).  At the direction of Benny Neeley, Woodrow Jones and Alice Jones did [on] several occasions send United States currency by way of Western Union.

(b) Woodrow and Alice Jones were delivered and did receive at their residence quantities of marijuana by way of UPS for Benny Neeley. Specifically, on September 24, 2003, UPS records indicate that a package was shipped from Brownsville, Texas to their residence weighing approximately 50 pounds.  These (sic) package was known by the defendants to contain marijuana.  When the package was received at their residence, Benny Neeley was contacted and he or someone at his direction picked up the package from this defendant.

-3-

(c) On February 3, 2003 Woodrow and Alice Jones were interviewed and admitted to sending United States currency via Western Union at the direction of Benny Neeley.  They further admitted to receiving packages at their residence.

[See Record Nos. 63 & 70; Plea Agreements, ¶ 4.]

Both Plea Agreements contain language that allow the United States to assert that the Defendants have admitted through this writing that more than one package of marijuana was received at their residence.  Conversely, certain ambiguities or typographical errors allow the Defendants to assert that only one package was received at their home.  For example, subparagraph (b) references the receipt of "quantities" of marijuana by the Jones at their home. It is unclear whether this is intended to refer to more than one shipment or simply the marijuana contained in one shipment. This ambiguity appears to be clarified in the next sentence, however, which indicates that the "packages" each weighed approximately 50 pounds each.  Based on this information, the Court would ordinarily assume that each shipment received at the Defendants' home weighed 50 pounds.  Later, the parties agree that the amount of marijuana attributable to them is between 60 and 80 kilograms.  Inasmuch as .4536 kilograms equals one pound, 50 pounds would equal 22.68 kilograms.  Therefore, reading the Plea Agreement in its entirety, it would seem that the Jones admitted to having received 3 or 4 shipments of marijuana.

Subparagraph (a) supports this reading by referring to several payments being sent *via* Western Union on behalf of the co-Defendant, Benny Neeley.  Next, while the UPS records that are referenced in subparagraph (b) relate to a single shipment, they appear to relate to the weight of that single shipment, as opposed to confirming the number of total shipments to the Jones' residence.  The remainder of paragraph (b) indicates that the Jones received multiple shipments

of marijuana, presumably at their residence.  Finally, in subparagraph (c), the Jones admit to receiving "packages" of marijuana at their residence.

   C.  The Rearraigment Hearings

  The transcript of the hearing held on November 22, 2004, regarding Defendant Woodrow Jones' rearraignment does not provide much clarification of the parties intentions beyond the language contained in the Plea Agreements.  During this hearing, the assistant United States Attorney reviewed the central provision of Mr. Jones' Plea Agreement.  With respect to the factual statement contained in paragraph four, Mr. West noted that:

> Beginning on Paragraph 4 on Page 2 is a recitation of the facts the United States could prove were this matter to proceed to trial.  By signing the plea agreement, Mr. Jones is acknowledging the facts, acknowledges that they are true, and acknowledges they could be proven at trial.

[Transcript of 11/22/04 Hearing; Record No. 69, p. 12]  Regarding forfeiture, Mr. West proceeded to point out the following:

> Mr. Jones expressly reserves the right to protest forfeiture of the real property listed in Count 3.  He understands forfeiture of the real estate shall be determined by this Court at a subsequent proceeding.

*Id.*

  In acknowledging his guilt, Mr. Jones explained that "[o]n the conspiracy on the – about wiring the money, I wired the money to Brownsville, Texas to receive marijuana shipped back from Texas to my address."  *Id.* at 25.  Later, the Court asked Mr. Jones about the factual statement contained in his Plea Agreement.

> THE COURT: Also, in your plea agreement, there are set forth in Paragraph 4 certain facts that the United States states that they (sic) could prove if this matter were to proceed to trial.  Do you agree, if this matter proceeded to trial, that they

could in fact prove those statements contained in Paragraph 4 of the plea agreement?

THE DEFENDANT: Yes, sir.

*   *   *

THE COURT: Mr. Jones, do you acknowledge the truth of those allegations?

THE DEFENDANT: Yes, sir.

*Id.* at 25-26.

Alice Jones was rearraigned on November 30, 2004. During the course of this hearing, Ms. Jones acknowledged the truth of the information contained in paragraph four of her Plea Agreement. [Record No. 99, p. 9; transcript of 11/30/04 rearraignment]  However, when explaining her actions in connection with Counts I and II, Ms. Jones initially acknowledged that she had wired money to Texas on behalf of Benny Neeley and had received one shipment of marijuana. [*See* Record No. 99, pp. 18.]  Later, when asked whether the additional information outlined in paragraph four was accurate, she acknowledged that it was although the Assistant United States Attorney stated that only 60 to 80 kilograms[1] of marijuana should be attributable to her.  *Id.*

      D.     The Sentencing Hearings

---

[1]    The transcript of the hearing held November 30, 2004, reflect that the U.S. attorney indicated that only 60 to 80 *grams* of marijuana should be attributed to Ms. Jones.  This appears to be a typographical error. The Court believes the U.S. attorney indicated *kilograms* rather than *grams.* [*See* Record No. 99, p. 19.] This would be much more consistent with the other evidence presented in the case and with the United States Sentencing Guideline calculations which applied a base offense level of 22 based on the amount of marijuana foreseeable to Ms. Jones as being between 60 and 80 kilograms.

Following preparation of presentence investigation reports, the Defendants were sentenced on March 28, 2005. In conjunction with the hearings held on this date, Defendant Woodrow Jones was sentenced to a term of imprisonment of 70 months on Count I and 70 months on Count II, with those terms to run concurrently. Mr. Jones also received a term of supervised release of three years and a special assessment of $200.00. Alice Jones was sentenced to a term of imprisonment of 18 months on Count I and 18 months on Count II (to run concurrent), three years supervised release, and a $200.00 special assessment. [Record Nos. 86, 87]

## II.    FORFEITURE (COUNT III)

On April 7, 2005, the United States moved for forfeiture of the property described in Count III of the Indictment pursuant to 21 U.S.C. § 853 and Rule 32.2(b) of the Federal Rules of Criminal Procedure. [Record No. 88] The motion noted that, in the Defendants' Plea Agreement:

> both defendants admit that they received at their residence packages delivered by UPS which were known to them to contain marijuana. Packages were received by the defendants at their residence over a period of approximately fourteen (14) months. One shipment weighing approximately 50 pounds was delivered to the defendants' residence on September 24, 2003.

[Record No. 88] As the United States properly noted, under Rule 32.2(b)(1), once the government seeks forfeiture of specific property, the Court must then determine whether it "has established the requisite nexus between the property and the offense." It argues that the admissions contained in the Defendants' Plea Agreements – specifically, their admission that they received one identified package of marijuana – establish the requisite nexus. Thus, under

21 U.S.C. § 853(a)(2), it asserts that the Court lacks discretion but, instead, is required to forfeit any of the Defendants' property "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission" of a drug trafficking offense. *United States v. Bieri*, 68 F.3d 232, 235 (8th Cir. 1995); *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003).

In response to the forfeiture motion, Defendant Alice Jones initially contended that forfeiture should not occur for a number of reasons. First, she asserted that the property in issue was a wedding gift from Alice Jones' parents. The transfer occurred by deed dated November 5, 2003, which she claims was *after* the one acknowledged package of marijuana was shipped to the Jones (September 24, 2003). Other than this one shipment, she asserts that no other packages of marijuana were shipped to the Jones at the property which is subject to the forfeiture motion.

Next, Ms. Jones contests the government's assertion that multiple marijuana shipments were made to the Jones' property over a fourteen month period. She contends that, other than the September 24th shipment, all of her other criminal activity was conducted away from the property and was limited to sending money orders to drug sources in Brownsville, Texas pursuant to Benny Neeley's instructions. In addition, she points out that the property which is the subject of the forfeiture proceeding was not transferred to her until after the September 24th shipment. Finally, she contends that forfeiture of her property would be grossly disproportionate to the gravity of her offense (and, therefore, in violation of the excessive fines clause). Under

-8-

such circumstances, she argues that the government has failed to establish a sufficient nexus with the property under Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure.[2]

With respect to the Defendant's argument that forfeiture would constitute an excessive fine, the United States notes that a violation of the underlying statute, 21 U.S.C. § 846 carries a maximum fine of $250,000.00; however, the property which is the subject of the forfeiture action is assessed at $3,000.00. Thus, under *United States v. Carpenter*, 317 F.3d 618 (6th Cir. 2003), the government asserts that the Court may compare the value of the property to the scope and sophistication of the entire operation and may consider the maximum fine for each co-defendant as a factor in determining the gravity of the offense. In the present case, it argues that when the amount of marijuana (greater than 190 pounds) is considered in conjunction with the maximum sentence (five years) and the combined maximum fine ($500,000.00), forfeiture of property valued at approximately $3,000.00 would not be disproportionate.

Testimony Presented At The July 20, 2005 Hearing

During the July 20th hearing, the Defendants presented testimony and other evidence supporting their argument that they obtained the property in issue after one package of marijuana was delivered there. In addition, the Defendants offered testimony and evidence that a one-half acre of the 3.2 acre tract was transferred to third parties and these third parties were aware at the time of transfer of the drug activity on the property. However, key parts of the testimony

---

[2]    Although Alice Jones' argued initially that a jury must determine whether a sufficient nexus has been established, she has not provided any authority contrary to the Sixth Circuit's recent decision in *United States v. Hall*, 411 F.3d 651 (6th Cir. 2005). At the outset of the forfeiture hearing held July 20, 2005, her attorney did not waive the issue but acknowledged that Hall is controlling with respect to the standard of proof and the fact that the forfeiture issue is to be decided by the Court as opposed to a jury. [See Record No. 98, pp. 4-5; Transcript of 7/20/05 forfeiture hearing.]

presented by the Defendants was contradicted by Jerel Hughes, a special agent with the Drug Enforcement Administration. The Court also notes that, while Woodrow Jones was present at the hearing, he did not present evidence separate than that presented by his wife. After evaluating all evidence presented, it appears that Mr. Jones role in the drug trafficking conspiracy was greater than his wife's role. However, as outlined below, her role in the conspiracy is sufficient to justify forfeiture of the subject property even if the Court does not consider Woodrow Jones activities on the property in connection with the conspiracy.

       1.      Virginia Clark

Virginia Clark is Alice Jones' mother. Ms. Clark testified that she transferred the property in question on November 5, 2003, to Alice and Woodrow Jones. She claims that the property was given to the Jones as a wedding gift and that similar transfers were made to her other children. The deed reflecting this transfer was introduced during the hearing as Defendants' Exhibit 1. It is recorded in the Laurel County Clerk's Office in Deed Book 564, Page 385.

Ms. Clark allegedly purchased the property in 2001. Sometime between the purchase in late 2001 and November 2003, the Jones moved a house trailer onto the property and began to exercise dominion and control over it. However, Ms. Clark denied any knowledge of drug activity on the property until a search was conducted by Hughes and other agents. [*See* Record No. 98, pp. 31-41.]

       2.      Alice Jones

-10-

Alice Jones claims that she first moved onto the subject property on Rooks Road sometime in 2001. Prior to the move, she testified that she lived in her trailer on rental property located at 31 Bentley Road in Laurel County, Kentucky. Although her house trailer has an attached wooden deck, she stated that it is detachable.

Ms. Jones testified that only one package of marijuana was sent to her residence and received there on September 24, 2003. She specifically denied receiving any other drug shipments at the property after this date. Further, she specifically denied sending wire transfers after September 24, 2003, and claimed that neither she nor her husband engaged in any other criminal activity on the property after this date.

According to Ms. Jones' testimony, the subject property has an assessed value of $3,000.00. She further testified that the value of the mobile home is "not much." Ms. Jones claimed that her husband agreed to sell a portion of the property to her brother (Norman Clark) and his girlfriend (Colleen Horne). Clark and Horne were apparently living on the property in another mobile home at the time this deal was made. However, as of this date, a deed transferring a portion of the subject property to Clark and Horne has not been prepared. [Record No. 98, pp. 41-49, 55]

During cross-examination, Ms. Jones denied that she was aware marijuana was contained in the package received on September 24, 2003. According to Jones, "[i]t just come in my name and address. That's all the part I had in it. And I didn't know at the time what it was until I was explained what was in it because it was never opened." Again, she specifically denied receiving other packages. When asked about the factual statement contained in paragraph 4(c) of her Plea

-11-

Agreement which indicates that she received more than one package at her home, Ms. Jones testified as follows:

> A.  Well, see, I didn't know – I pleaded guilty for the second charge that I didn't have nothing to do with.  The only thing I done was plead guilty because it come in my name and my address.  I thought I had to plead guilty to it.  I didn't know I didn't have to, because I didn't have nothing else to do with it, all but it coming in my name and address.

*   *   *

> Q.  And what were you wiring it for Benny Neeley for?

> A.  I really didn't – really didn't have no idea about nothing until they explained things that was going on.  You know, I didn't know.  I was left in the dark.  I didn't know every – all the detail about nothing.

[Record No. 98, pp. 51-52] And while Ms. Jones admitted that Benny Neeley visited her home "a few times" she described the visits as merely social visits.  *Id.*, pp. 52-53.

After the undersigned expressed concern that Ms. Jones might have provided false testimony by disavowing earlier testimony from her rearraignment and sentencing hearings, her attorney intervened and asserted that "there's no question, she's guilty of these charges, and she apologizes for any answer that would indicate contrary to that."  *Id.* pp. 57-58.

3.      Colleen Sue Horne

Finally, the Defendants presented the testimony of Colleen Sue Horne in support of their claim that one-half acre of the subject property was transferred to Horne and Norman Clark and that, at the time of the transfer, Horne was unaware of drug trafficking activities on the property. In support of her testimony, Horne produced three checks totaling $1,400.00 and representing a portion of the purchase price of $2,500.00.  (Horne claimed that the balance was paid in cash

-12-

and by a couple of other checks that she has been unable to obtain from the bank.)  Thus, while the Jones claims that the total property (excluding mobile homes) has a total value of $3,000.00, they assert that approximately 1/6 of the total acreage was sold for $2,500.00.   Horne acknowledges, however, that the one-half acre section has not been surveyed and a deed of conveyance has not been prepared.  Finally, she testified that the deal for the property was reached in March 2004 with the final payment being made on September 6, 2004.  *Id.* at 59-63.

Horne's credibility was fatally damaged on cross-examination.  Ms. Horne had contacted Agent Hughes several months before the March 2004 deal to acquire the property to advise Hughes of illegal drug activity on the Jones property.  However, when questioned about her initial contact with Hughes, Horne claimed that she did not know of any such activity on the property until warrants were being served several months later.  *Id.* at 63-65.

> Q.  Do you remember meeting with Agent Jerel Hughes on December 30th, 2003, concerning drug trafficking activities in the area?
>
> A.  He had met with me wanting me to testify against them, and I said I have nothing in it.
>
> Q.  Did you make any statements to Agent Hughes concerning Benny Neeley, describing how Benny Neeley, acquires OxyContins and sells those and –
>
> A.  I never said a word.
>
> Q.  As to how Woodrow Jones and Alice Creech Jones sell for Benny Neeley? Did you make any of those statements?
>
> A.  No, sir.
>
> Q.  Are you – did you tell Agent Hughes and Baker that you were aware of Benny Neeley, David Morgan, and Jerry Wilson importing and distributing large quantities of marijuana together?

A.  No sir, not at that time.

Q.  And as I understand your testimony, you are saying that when you were writing these checks in '04, that you were not aware of any illegal drug activity by Alice Creech Jones and Woodrow Jones?

A.  No, sir, I did not know nothing about this conspiracy or mailing marijuana or whatever they were doing, at that time, no, sir, I did not know nothing.

\* \* \*

Q.  So you would dispute Agent Hughes if he has a different recollection of meetings and statements you made to him at that meeting?

A.  I would have to, yes, sir.

Q.  And would you dispute the date being 12-30-03 if that's the date his records show that he met and talked to you?

A.  I don't think I would dispute that date, but he did attempt to talk to me and attempt to get me to rat everybody out.

*Id*. at 64-65, 67.  In addition to these statements, Horne testified that Agent Hughes made the initial contact with her.  *Id.* at 68.

4.    Jerel Hughes

Agent Hughes testified during the United States' case-in-chief and on rebuttal following the testimony of Colleen Horne. [Record No. 98, pp. 12-30, 70-73.] During rebuttal, Agent Hughes testified concerning his meeting with Horne and Agent Fred Baker on December 30, 2003.  This meeting occurred after Horne called to volunteer information concerning drug trafficking near her residence in Laurel County.  According to Hughes:

She stated to myself and Special Agent Baker that Benny Neeley was obtaining large quantities of OxyContin from an unknown source of supply and that Neeley was providing OxyContin to Woodrow Jones and Alice Creech Jones, who sold them for Neeley from their residence located on Rooks Road in Laurel County,

-14-

Kentucky.  And she further stated that Woodrow and Alice Jones only sell to people who are well-known to them.

She further stated that Beeny Neeley, David Morgan, and Jerry Wilson are in the business of importing and distributing large quantities of marijuana together.  She went on to state that approximately seven months prior to this interview of December the 30th, '03, she observed approximately ten pounds of marijuana at the residence of David Morgan.  She further advised that the marijuana appeared to be of domestic origin, not Mexican marijuana, and she thinks that David Morgan obtained the marijuana from Jerry Wilson.

She stated that ten months prior to the interview, ten pounds of – she observed ten pounds – approximately ten pounds of marijuana at the residence of Jerry Wilson on Rooks Road in Laurel County.

\* \* \*

Q.  I'll ask you again, did you contact her or did she contact you to give you this information?

A.  She contacted me.

*Id.* at 70-71.  The undersigned finds the testimony of Agent Hughes to be credible.  In addition, it appears to be consistent with interview notes made immediately following his meeting with Horne.  Agent Hughes' testimony totally discredits the sworn statements of Horne with respect to her knowledge of drug activity occurring on the property before the alleged deal for a portion of it.

During his initial testimony, Agent Hughes also provided relevant testimony concerning the scope of the drug conspiracy and the Jones' involvement in it.  *Id*. at 12-30.  During his initial meeting with the Jones in March 2004, Woodrow Jones explained his involvement and the involvement of his wife in the drug conspiracy.  The conspiracy involved the receipt of packages of marijuana at their residence at 1417 Rooks Road.  According to Hughes, the Jones had lived

-15-

at this address for several years.  In fact, as early as 1992 Mr. Jones was living at the same address.  *Id.* at 14.  The overall conspiracy involved at least 62 people in several states and consisted of large sums of currency being wire transferred to sources of supply in Texas.  In turn, the supplier would ship marijuana to Kentucky and other states.  United Parcel Service was used to transfer the marijuana to Kentucky.

Agent Hughes confirmed during the course of the investigation that Alice and Woodrow Jones wire transferred at least $30,000 as part of the conspiracy and received at least one package of marijuana.  While he believed more packages were shipped to their address, he was unable to confirm additional shipments due to poor record keeping practices of UPS.  Notwithstanding this fact, Hughes testified, based on his training and expertise, that the Jones received more packages at their Rooks Road address.  In addition to the Jones, Benny Neeley and several others, Agent Hughes identified Colleen Horne and Norman Dean Clark as being involved in the conspiracy. *Id.* at 15-16.

During his direct examination, Hughes further identified Colleen Horne as his source of information.  *Id.* at 17.  He testified that he subsequently corroborated her statements concerning the identity of the conspirators, how they transferred money, how they received the marijuana, and who was distributing it.  According to Hughes:

> The property in question, the information we received from numerous sources from working the case, is that Benny Neeley, who headed the Kentucky end of the organization, lived a stone's throw across the road from the property in question where Alice Creech and Woodrow Jones resided.  He would come to their residence and bring them money or have it delivered, and along with theat money would be directions of who to wire the money to.  They would in turn take the money to a Western Union office and wire transfer it to the source of supply in

Texas.  They would then receive a package or packages of marijuana that Benny Neeley would come down to that residence and collect.

I've also received information that they would have – these conspirators, a group of them, not necessarily all, would hold meetings on the property in question, 1417 Rooks Road, I believe, where Mr. Jones and Ms. Creech – or Mr. and Mrs. Jones now live at.  Once the marijuana arrived, they would hold meetings and plan the distribution of it.

I also have information that they were obtaining OxyContin and distributing it from this residence and had for an extended period of time.

*Id.* at 17-18.  In addition, Agent Hughes offered additional testimony that wire transfers of money continued until at least January 2004.  *Id.* at 20.

On cross-examination, Hughes confirmed that he was able to located records confirming only one shipment of approximately 50 pounds of marijuana to the Jones' residence.  However, he disagreed that Alice Jones' involvement in the conspiracy ended in September 2003.  Instead, he testified that he was aware of a wire transfer she made on October 6, 2003.  *Id.* at 23.  However, although the conspiracy continued beyond November 2003, he was unable to identify any overt acts undertaken by Ms. Jones after the date she obtained title to the property.  *Id.* at 24.  With respect to the date the Jones acquired the property, Hughes testified that:

You're correct in that those specific overt acts that they committed in furtherance of the conspiracy took place on those dates – prior to them receiving that property.  However, they did not exit the conspiracy at that time.  I have no reason to believe that they didn't continue to distribute narcotics from that residence up until the point that we shut down the Kentucky end of the conspiracy [March 2004].

*Id.* at 25.  According to Hughes, his testimony in regard to the Jones continuing involvement was based on purchases of narcotics that were made after this date, the results of the search warrants executed in connection with the case, and other people interviewed.  *Id.*  Hughes testimony in

-17-

this regard was not challenged or otherwise rebutted during cross-examination or by the presentation of other proof offered by the Defendants.

Concerning the "mobile" nature of the Jones' trailer, Agent Hughes testified that it was permanently affixed to the property by underskirting and a rear wooden deck. In Hughes words, "it isn't going anywhere." *Id.* at 27. In addition to the mobile home, Hughes stated that criminal activity occurred on other areas of the property and involved other individuals, including Norman Clark. *Id.* at 28.

### III.    FACTUAL FINDINGS

After considering the testimony and other evidence offered during the July 20, 2005 hearing, the Court reaches the following conclusions concerning the factual disputes presented by the parties:

1. Defendants Woodrow and Alice Jones were involved in a conspiracy that involved *multiple* shipments of marijuana to their home prior to the time title was transferred to them in November 2003. The fact that several shipments were made to the property is further supported by the wire transfers made by the Jones to other members of the conspiracy. While there is only confirmation of one UPS shipment, the totality of the evidence does not support a finding that this was the only shipment that was made to the Jones at their residence. Any ambiguity in the Defendants' Plea Agreements concerning the number of shipments of marijuana to their residence was clarified by the testimony of Agent Hughes and other evidence and testimony presented during the forfeiture hearing held July 20, 2005.

-18-

2.  In addition to shipments of marijuana, the Jones property was used to facilitate other criminal activity occurring both before and after they acquired title to the land.  This includes meetings at which Benny Neeley would provide the Jones with money to be wire transferred to other members of the conspiracy. At the time these meetings occurred, the Jones were fully aware that the money was proceeds of drug trafficking activity.

2.  In all likelihood, the Defendants moved onto the property in 2001 if not earlier.  Their involvement in the conspiracy and on the property in question occurred during the dates alleged in the indictment (January 2003 through March 2004).  Further, additional criminal activity occurred on this property both before and after the date of transfer to the Jones (November 2004).  In this regard, the Court finds DEA Special Agent Jerel Hughes to be credible.  Conversely, the Court does not find the testimony offered by Defendant Alice Jones to be credible.  In fact, the Court will totally discounts her statements and testimony.  It appears that Ms. Jones testimony was offered without regard for the truth and solely in an attempt to prevent forfeiture of the subject property.

3.  Colleen Horne and Norman Clark were aware of criminal activity on the property prior to the time they attempted to purchase a portion of it from the Jones.  And while it appears that Norman Clark may have been involved in this criminal activity, the Court need not make a specific factual finding in this regard.  However, it is clear that Colleen Horne offered perjured testimony with respect to her meeting and conversation with Agent Hughes in December 2003.  At the time Horne contacted Hughes, Horne was fully-aware of the Jones' involvement in the conspiracy that was taking place on the property owned by Woodrow and Alice Jones.  While

-19-

Colleen Horne and Norman Clark may have attempted to purchase a portion of the property from the Jones, they did so with knowledge that the property was being used to facilitate ongoing drug trafficking activities.

4.  Ms. Jones' parents transferred legal title to Alice and Woodrow Jones on  November 5, 2003.  The property has an assessed value of $3,000.00, which does not include the value of the mobile home which is affixed to the property.  The Court finds the value of the mobile home to be nominal.  The real property was a gift and was not acquired in connection with drug proceeds.  However, criminal activity in furtherance of the conspiracy occurred within the mobile home and at other areas of the real property which is the subject of the forfeiture count of the indictment (Count III).  Again, this activity occurred prior to and after November 5, 2003.

5.  The Jones have intended to permanently attach the mobile home to the property by underskirting and the addition of a deck on the rear portion of the trailer.  Further, from late 2001 until at least March 2004, the Jones have exercised dominion and control over the entire 3.2 acres in issue.

6.  The Jones have not transferred legal title to a portion of the subject property to Horne and Clark.

## IV.    LEGAL CONCLUSIONS

The burden of proof in forfeiture cases is by a preponderance of the evidence.  *United States v. Corrado*, 227 F.3d 543 (6th Cir. 2000); *United States v. Hall*, 411 F.3d 651 (6th Cir. 2005).  Under Rule 32.2(b)(1), the United States has established a nexus between the property in issue and the criminal activity undertaken by Defendants Woodrow and Alice Jones as well

as other members of the conspiracy. In addition to receiving multiple packages of marijuana at their residence, the property was used for meeting and other purposes to further the object of the conspiracy. This is a sufficient nexus for purposes of forfeiture.

Here, significant criminal activity pertaining to the admitted conspiracy occurred before and after the Jones acquired the property in question. Therefore, the cases cited by Alice Jones are distinguishable. *See United States v. O'Dell*, 247 F.3d 655, 685 (6th Cir. 2001) (forfeiture section relates to property the defendants owned at the time the offense occurred as opposed to the time of conviction, citing: *In re Forfeiture Hearing as to Caplin and Drysdale, Chartered*, 837 F.2d 637, 640 (4th Cir. 1988), and *In re Moffit, Zwerling and Kemler, P.C.*, 846 F.Supp. 463, 476 (E.D.Va. 1995)).

A punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense. *See United States v. Bajakajian*, 524 U.S. 321 (1998). In the present case, the Court does not believe there is any merit in the Defendants assertions that forfeiture would be unduly harsh or would violate the excessive fines clause. Under the facts presented, when the value of the property is compared to the gravity of the offense, forfeiture of property valued at approximately $3,000.00 is not disproportionate. Although the Court declined at sentencing to impose a monetary fine upon the Defendants, it did so with the understanding that the property in issue was subject to forfeiture proceedings. Having considered the nature of the Defendants drug trafficking offenses and the specific activities on the property after the Jones acquired an interest in it, forfeiture of the property is not excessive.

Finally, the Court concludes that neither Colleen Horne nor Norman Clark have standing to assert a claim in this action.  They have no interest in the property under 21 U.S.C. § 853(n)(6).  Based on the foregoing findings and conclusions, it is hereby

**ORDERED** that the United States Motion for a Preliminary Judgment of Forfeiture [Record No. 88] is **GRANTED**.

This 21st day of August, 2005.

Signed By:

*Danny C. Reeves*   DCR

**United States District Judge**